# EXHIBIT A

Regular Arbitration Panel

| | |
|---|---|
| In the Matter of Arbitration § | |
| Between § | Grievant: Sherilyn Gerhardt |
| Southwest Airlines Company § | |
| And § | Case No.: 42-0052 |
| Transport Workers Union Of America, AFL-CIO, § Air Transport Local 556 § | |

Before: Kathy Fragnoli, Esq.
Appearances:

    For the Employer:    Christina Bennett
                                   Southwest Airlines Co.
                                   2702 Love Field Drive
                                   Dallas, TX 75235

    For the Employee:    Joseph Y. Ahmad and Tiffany N. Isaac
                                   Ahmad, Zavitsanos & Anaipakos, P.C.
                                   2460 One Houston Center
                                   Houston, TX 77010

| | |
|---|---|
| **Place of Hearing** | Dallas, TX |
| **Date of Hearing:** | April 16, 2009 |
| **Close of Hearing** | May 21, 2009 |
| **Date of Award:** | June 17, 2009 |
| **Relevant Contract Provisions:** | Article 19 |
| **Type of Grievance:** | Discipline |

### Award Summary

The Grievant shall be returned to duty. However, because the company followed its own procedures set forth in its Alcohol Misuse Policy, this arbitrator is of the opinion that the proper remedy is to reinstate Grievant effective immediately with no back pay.

*[signature]*

Kathy Fragnoli, Esq.
Arbitrator
June 17, 2009

## Issue

The issues to be decided in this case are: (1) whether Southwest Airlines Company had just cause to terminate Grievant; and (2) if not, what remedy is appropriate.

## Background

Southwest Airlines Company and Transport Workers Union of America, AFL-CIO, Local 556 are parties to a 2008 collective bargaining agreement covering rates of pay, rules and working conditions for the flight attendants working for Southwest. Article 19 contains the parties' negotiated grievance procedure, and also provides that flight attendants may be discharged only for just cause.

Sherilyn Gerhardt worked as a Flight Attendant for Continental Airlines for eight months before embarking on a career as a Flight Attendant with Southwest that would span nearly 20 years. The Department of Transportation categorizes Flight Attendants as performing safety-sensitive duties. For this reason, Flight Attendants are subject to Southwest's Alcohol Misuse Policy. This policy was approved by the Federal Aviation Administration and has been existence since 1995. Southwest's Alcohol Misuse Policy requires that Flight Attendants submit to an alcohol breath test if a supervisor trained in detecting the symptoms of alcohol misuse has a reasonable suspicion that the individual is impaired due to alcohol. Two supervisors (at least one of whom has attended Southwest's Drug and Alcohol Training Program) must substantiate and concur in the decision to test an employee that is reasonably suspected of alcohol abuse. Southwest's Alcohol Misuse policy provides that if this requirement is met, the employee must immediately submit to an Evidential Breath Test (EBT).[1] The policy provides that an EBT result of .02 or greater will result in the employee's immediate removal from duty. An EBT of .02 or greater will also trigger the requirement that the employee be retested. A single EBT result of .042 or greater, or two consecutive EBT results of .02 or greater, will result in the employee's termination. Federal Aviation Regulation 91.17 similarly expresses a proscription on flight crewmembers working while under the influence of alcohol. Prior to the events at issue in this matter, Grievant had never been suspected of violating Southwest's Alcohol Misuse Policy.

Prior to September 1, 2008 Grievant had been off work to recover from a shoulder injury. She had a doctor's note that would have allowed her to remain off work beyond September 1, 2008. Grievant, however, elected to return to work prior to the expiration of her doctor's note. At 6:30 a.m. the morning of September 1, 2008, Grievant woke up, interacted with her husband,

---

[1] Refusal to submit to an EBT is grounds for termination.

Robert Byrd, got dressed, packed her suitcase, made the 45 minute drive to the Houston In-flight Base without incident, parked her car in the parking garage whereupon she states that she gargled with mouthwash to rid herself of "coffee breath," took a shuttle, proceeded through a security checkpoint and two password-protected doorways. Grievant had arrived in the Flight Attendant Lounge between 15 and 17 minutes before her mandatory report time. She engaged in a conversation with fellow flight attendant Lynn Newman, and checked in for work on a computer, using her assigned employee number.

Around 9:00 a.m., Grievant approached In-Flight Supervisor Becky Green with a doctor's note, and also inquired into her receipt of a 15-year pin. As of September 1, 2008, Green had undergone Southwest's Drug and Alcohol Training on four prior occasions. During this training, participants are trained to look for signs of alcohol-related impairment. According to Green, during this conversation she noticed that Grievant had bloodshot eyes and an odor of alcohol on her breath. Green and the Grievant proceeded to the copier room to look for her 15-year pin. Other than Grievant's bloodshot eyes and odor of alcohol, Green did not notice any other signs of alcohol-related impairment. Green did not ask whether other medical conditions could have caused Grievant's bloodshot eyes and odor of alcohol.

At approximately 9:20 a.m., Green asked Supervisor Caren Eaton to observe Grievant as well. As of September 1, 2008, Eaton had undergone Southwest's Drug and Alcohol Training on eight prior occasions. Eaton reported that she, too, smelled alcohol on her breath. Around 9:30 a.m., Green and Eaton informed Supervisor Katrina Bannon that they had observed Grievant and noted the smell of alcohol on her breath and that her eyes were bloodshot. Bannon provided Green and Eaton the Drug and Alcohol hotline number and asked them to call Scheduling and pull Grievant from her scheduled flight. Bannon had recently undergone Southwest's Drug and Alcohol Training on July 22, 2008. Bannon also proceeded to observe Grievant and concurred with Green's and Eaton's observations. All three supervisors agreed that Grievant should be pulled from her flight and tested for alcohol pursuant to Southwest's Drug & Alcohol Policy and Procedures. Bannon brought Grievant to her office while Eaton spoke with Renee Northcutt, whom she reached when she called the Drug and Alcohol hotline number. Northcutt also spoke with Green, who confirmed that she had also observed signs of alcohol-related impairment. Northcutt indicated that she would arrange for a collector to come to the airport to administer a breath test. While Green was speaking to Northcutt, Eaton called the scheduling department and pulled Grievant from her scheduled flight. Green, Eaton and Bannon completed separate Reasonable Cause/Suspicion Forms and Irregularity Reports, pursuant to Southwest policy.

Grievant remained in Bannon's office until the collector, Michael DeLisco arrived around 11:00 a.m. and called Green to inform her that he had arrived. At that point, Green and Eaton escorted Grievant to the testing room. DeLisco administered a breath test using the Draeger 7110MK-III-C, a breath test machine that utilizes fuel cell and infrared technology.[2] This machine is included on the list of devices the DOT has approved for breath test analysis. The particular machine used by DeLisco underwent an accuracy check in October 2007, in accordance with the Quality Assurance Plan for the 7110MK-III-C, and was within calibration at the time. Grievant's first breath test was .162. Because Grievant's first score was in excess of .042, DeLisco was required to conduct a confirmation test. The confirmation test, which took place 15 minutes after the first test, indicated that Grievant had a blood alcohol content (BAC) of .153. DeLisco detected an odor of alcohol on Grievant's breath and noticed that her eyes were bloodshot. He testified that she did not seem drunk and was not disheveled. Although he testified that she seemed unsure of her movements when she went through her purse, Grievant testified that she was not allowed to bring her purse in with her to the testing room.

Grievant informed Green and Eaton that the test was positive, and she called a friend, Eric Smith, to pick her up. Smith and his wife picked up Grievant, and they drove Grievant to her car in the garage. Smith drove Grievant's car home, and Grievant rode with Smith's wife.

On September 4, 2009, Base Manager Kevin Clark conducted a fact-finding meeting, at which Grievant postulated that the EBT was positive because she suffers from gastro esophageal reflux disease (GERD), which causes her to burp more frequently, and that she has a high functioning liver that causes alcohol to stay in her stomach longer. Grievant offered to give Clark medical documents that corroborate that she suffered from GERD but Clark indicated that he was not qualified to read the records and suggested that she provide them to the company's Medical Review Officer (MRO). Grievant did not submit these documents to the MRO.

On September 9, 2008, Clark sent Grievant a certified letter, which stated, in pertinent part:

> "On September 4, 2008, a fact-finding meeting was held with you in regards to the results of your recent alcohol test. In attendance, were you, TWU Union Representative Stephanie Tillman, Inflight Services Supervisor Katrina Bannon and me.
>
> During our meeting, we discussed that two Inflight Services Supervisors noticed that you smelled of alcohol after checking in for your assignment on September 1. Southwest had reasonable suspicion that you violated the Company's alcohol misuse prohibitions. In accordance to *Southwest Airlines Policies on a Drug-Free Workplace and Alcohol*

---

[2] There is credible evidence provided by Captain Don Renfro that the fuel cell had been removed pursuant to Southwest policy.

*Misuse*, you were required to submit to an alcohol test. Pursuant to our regulations, any person whose EBT test results is .04 or greater will be terminated. Your test results indicated an EBT greater than .04.

In addition to violating Southwest's Drug Free Workplace and Alcohol Misuse Policy, your conduct also violated the Flight Attendant Work and Conduct Rules, including but not limited to, Class I, #7:

**'Reporting for duty or being on duty while under the influence of any alcoholic beverage or if the use of alcoholic beverages is evident regardless of the time elapsed since such use (FAR 121.459 and 91.17).'**

Accordingly, your employment with Southwest Airlines is terminated."

On September 10, 2008, Local 556 filed grievance number 42-0052, challenging Grievant's termination. Grievance 42-0052 was heard at Step One of the grievance procedure on October 8, 2008, and Southwest denied the grievance that same day. Grievant disagreed with this outcome, and on October 8, 2008 appealed the decision to the Flight Attendant Board of Adjustment. On December 22, 2008, however, the Union notified Southwest that it extended the time frame for Board of Adjustment review by 60 days due to special circumstances, and on January 29, 2009, attorneys retained by the Union requested that the parties bypass the Board of Adjustment altogether and proceed directly to arbitration.

At an arbitration hearing held on April 16, 2009, in the Wings conference room within the Inflight Department located at Southwest's headquarters building at 2702 Love Field Drive, Dallas, Texas, Christina Bennett, Senior Attorney, Labor & Employee Relations represented Southwest. Joseph Y. Ahmad and Tiffany N. Isaac represented the Union and Grievant. The parties agreed that the matter was properly before this arbitrator and that this arbitrator would retain jurisdiction as to remedy. Southwest submitted testimony of Green, Clark, Occupational Medicine Physician Chauncey Benedict Thuss, Jr., Team Lead of the Drug and Alcohol Team Pamela Childers, Manager of Southwest's Regulatory Compliance Drug and Alcohol Testing Program Nancy Weeks, and Michael DeLisco in support of its position that it had just cause to terminate Grievant. The Union called the Grievant, Smith, Newman, Southwest Pilot Don Renfro and Byrd to refute Southwest's position. The parties agreed to submit post-hearing briefs and arbitral authority in support of their respective positions. The opinion and award that follows is based on the evidentiary record in this case, the post-hearing briefing submitted by both parties, and the arbitral authority submitted by the parties.

## Relevant Contract Language

Article 19 Grievance Procedures

Dismissal or Disciplinary Procedure

> I. A Flight Attendant shall not be disciplined or discharged without just cause except as provided in Article 7.[3]

## Position of the Union

The Union argues that Southwest did not have just cause to terminate Grievant because she did not violate Southwest's Drug and Alcohol Misuse Policy. According to the Union, there is no possible way Grievant could have functioned as she did the morning of September 1, 2008 had she had a BAC of .162, or even .153. The Union introduced testimony that the morning of September 1, 2008, Grievant got ready for work, packed her suitcase for her trip, drove 48 miles to work, during which she spoke with her father and step-mother on the phone, parked her car in the lines in the parking garage, went through airport security, proceeded through two password-protected doorways and an elevator that required a code as well, checked in for work using her employee number, had a conversation with fellow Flight Attendant Lynn Newman (who did not detect any signs of intoxication), spoke coherently with her supervisors, remembered exactly where she parked her car in the parking garage and never used the restroom the entire morning. These circumstances, the Union argues, are inconsistent with someone with a BAC of .162. The Union introduced testimony that in order to have a BAC of .162, Grievant would have had to skip breakfast and drink heavily that morning at home and on her way to work.

The Union's primary witness was Captain Don Renfro. The Union introduced, through the testimony of Captain Renfro, that had Grievant actually had a BAC of even .153 when she was tested she would have had a BAC of at least .22 at the time she left for work, given alcohol's burn rate. Captain Don Renfro has a background in toxicology and was a former instructor and breath technician. He worked with the Justice Department for 15 years as an undercover agent and was tasked with running a field lab that tested over 1,000 subjects for blood alcohol.

He testified that he has worked most of his airline career as part of a union/management team on drug and alcohol issues and, in fact, was part of the decision making process at Southwest to use the Draeger. Since 1994, he testified that he has done toxicology work with the pilot's union. He testified that he never met the Grievant but when he heard her story from a friend and reviewed her records, he felt as though there was "injustice by a machine." An individual with a

---

[3] Article 7 addresses the rights of probationary flight attendants.

BAC of at least .22, according to Renfro, would have found it nearly impossible to accomplish the tasks that Grievant performed the morning of September 1, 2008. Also, according to Renfro, an individual with a BAC of .15 is "unmistakably drunk," with "all faculties seriously affected." At the very least, according to Renfro, Grievant would have had difficulty standing straight and would have slurred her speech had she actually had a BAC of .162. Her pupils would have also been dilated and her face flushed from vein constriction had she had a BAC of .162. Lynn Newman, who was the first Southwest employee to have a conversation with Grievant that morning, testified that she did not smell any alcohol on Grievant's breath and that Grievant did not show any signs of intoxication during their conversation. The three supervisors that concurred that Grievant should submit to an EBT noted only an odor of alcohol on her breath[4] and the appearance of bloodshot eyes, both symptoms for which the Union has proffered alternate explanations.

The Union introduced evidence that Grievant had only one drink the evening of August 31 to help her sleep, and was finished with the drink by 11:00 p.m. Shortly thereafter, Grievant heard her daughter crying about Grievant's anticipated trip the next day, and so Grievant stayed up comforting her daughter and got only four and a half hours of sleep. Lack of sleep, the Union points out, can cause bloodshot eyes.

Grievant also introduced evidence, in the form of a doctor's note and her sworn testimony, that she suffers from acid reflux disease, a condition that can result in a false positive on an EBT because it causes people to burp more often, artificially increasing mouth alcohol levels. According to Grievant, she burped continuously through the EBT. Grievant also introduced testimony that she underwent a rapid weight loss of 12 pounds in two weeks. The Union introduced testimony that rapid weight loss can result in a false positive as well. If someone is not getting an adequate amount of glucose, the liver breaks down protein to create glucose, using fat as energy. During the process, the liver converts these fats to different kinds of ketones, one of which is acetone. Excess acetones are released in the breath, and are detected by EBT machines as ethyl alcohol, the same alcohol found in alcoholic beverages. Either of these two conditions, the Union argued, could have caused a false positive on the EBT. Through Captain Renfro's testimony, the Union argued that the drastic difference between Grievant's first and second EBTs indicates that the EBT machine was detecting some other substance besides ethyl alcohol.

---

[4] The Union also introduced evidence that alcohol has no odor.

In addition to the testimony of Green, Eaton and Bannon, who all testified that Grievant did not act intoxicated the morning of September 1, 2008, the Union introduced testimony from Byrd, who confirmed that Grievant was up late comforting her daughter. He also testified, like Green, Eaton and Bannon, that Grievant did not exhibit signs of intoxication the morning of September 1. Smith similarly testified that Grievant did not appear intoxicated when he and his wife picked her up that morning, and he also testified that Grievant does not have an alcohol habit. Newman also testified that Grievant did not show signs of intoxication during the conversation that took place when Grievant first arrived in the Flight Attendant Lounge.

The Union also points to other behaviors that are inconsistent with someone who has reported to work under the influence of alcohol. First, Grievant initiated a conversation with Green, her supervisor. Grievant also declined Union representation during the morning of September 1. She also did not use the restroom from 9:15 a.m. until after 1:00 p.m., a physical impossibility had she consumed enough alcohol to register a .162 on the EBT. DeLisco, who testified that Grievant showed signs of intoxication by fumbling through her purse is not to be believed, claims the Union, because his testimony is contradicted by Newman, Smith, Byrd, Green, Eaton and Bannon, who did not note any outward signs of intoxication. Moreover, argues the Union, Grievant testified that she was not allowed to bring a purse into the testing room, and Byrd testified that Grievant does not carry a purse when she travels, only a wallet.

In summary, the Union argues that the evidence that the EBT yielded a false positive is overwhelming, and shows that Southwest was without just cause to terminate her employment.

### Position of the Employer

Southwest argues that it had just cause to terminate Grievant because (1) Grievant's EBT results were in excess of the level prescribed by the alcohol misuse disciplinary policy; (2) Southwest's rule for terminating Grievant for her test results is a reasonable one and not inconsistent with any provision of the CBA; and (3) termination was the appropriate penalty. Citing *In re USAIR and IAMAW*, 1991 WL 706600 (Crable, 1991). Southwest points out that the EBT machine used by DeLisco is included on the National Highway Safety Administration (NHTSA) conforming products list (CPL) of evidential breath measuring devices. To be included on the CPL, Southwest argues, the NHTSA must review and approve the Quality Assurance Plan (QAP) for the device. Since the Draeger 7110MK3 is included on the CPL, it is a DOT-approved device. Southwest points out that the Union participated in crafting the airline's Alcohol Misuse Policy and was a party to a prior arbitration where it was held that the Alcohol Misuse Policy is reasonable. This policy is also, argues Southwest, consistent with the parties' CBA, which

allows for the company to implement reasonable rules and regulations and to provide for a safe work environment.

Southwest has a compelling interest in safety, and its responsibility to provide the safest possible service. As such, the "termination sanction ... is considered by Southwest to be an essential tool for the promotion of the airline's safe operation." Moreover, argues Southwest, because Grievant's EBT results were greater than .042, the Alcohol Misuse Policy mandated termination. Given these circumstances, termination was the appropriate penalty based upon the Grievant's test results. Moreover, those involved in the events that took place September 1 flawlessly carried out the Alcohol Misuse Policy. Therefore, barring any irregularities in the testing process, there is no justification for discipline short of termination.

Southwest does not find credible Grievant's claim that acid reflux disease caused a false positive during the EBT, pointing out that she never provided this information to Southwest's Medical Review Officer, instead electing to wait seven and a half months post-termination to raise it during this arbitration. Moreover, argues Southwest, no witnesses, including tester DeLisco, could confirm that Grievant burped frequently during the morning of September 1, undermining the Union's theory that acid reflux-triggered burping caused a false positive. Southwest challenges Captain Renfro's qualifications, who testified that the Draeger could register a false positive because of Grievant's acid reflux disease. In contrast to Renfro, Southwest's expert witness, Dr. Thuss, testified that because acid reflux involves stomach acid entering the esophagus acid reflux disease would not affect EBT results and, at any rate, if this occurred on the first test it should not recur on the second test. Dr. Thuss also testified that the Draeger 7110MK3 does not register ketones as ethyl alcohol and therefore Grievant's results would not be affected by her rapid and sudden weight loss. Dr. Thuss testified that alcohol tolerance in heavy drinkers or alcoholics is increased, so their physical symptoms of intoxication may not necessarily be apparent at a .162 blood alcohol level. Of course, the company asserts that it is irrelevant whether Grievant is an alcoholic—the analysis begins and ends with the fact that Grievant's EBT was greater than .042.

Finally, Southwest argues that Grievant's work history is irrelevant, because the Alcohol Misuse Policy mandates termination without regard for prior work offenses or job performance.

## Discussion

**Did Southwest Airlines Company have just cause to terminate Grievant?**

Southwest's Alcohol Misuse policy provides that a single EBT result of .042 or greater, or two consecutive EBT results of .02 or greater, will result in the employee's termination. Federal Aviation Regulation 91.17 also provides that no person may act or attempt to act as a crewmember of a civil aircraft while having a .04 by weight or more alcohol in the blood. Upon reasonable suspicion of alcohol intoxication Grievant was ordered to submit to an EBT. She complied with this order and the EBT device registered a BAC the first time of .162 and the second time of .153. These results were, however, sharply at odds with all other evidence from that day, which overwhelmingly supported the Union's position that the EBT machine registered a false positive.

Renfro testified credibly[5] that if Grievant had a .162 BAC at the time of the test, she would have had a BAC of at least .22 at the time she left for work. Dr. Thuss, Southwest's retained expert, acknowledged that Grievant would have clearly been impaired at a level of .2, and Grievant's husband testified that she was not impaired when she left for work that morning. Similarly, an individual with a BAC of .15 is "unmistakably drunk," with "all faculties seriously affected," and at the very least Grievant would have had a hard time standing, would have slurred her speech and would have had a flushed face and dilated pupils. None of the Southwest's witnesses testified to noticing any of these symptoms of intoxication. The only Southwest witness that reported any behavioral sign of intoxication was DeLisco, who reported that Grievant rifled through her purse during the testing process. Grievant testified unequivocally, however, that she was not allowed to bring her purse with her into the testing room. Given the fact that DeLisco has performed "hundreds" of EBTs for Southwest, it is likely that Grievant's memory of her EBT is keener than that of DeLisco. Indeed, the first person to have a protracted conversation with Grievant at work that morning, Newman,[6] did not notice any signs of intoxication and, of course, had Grievant imbibed prior to coming to work Newman would have been more likely to have noticed the symptoms of intoxication than any of Southwest's witnesses. Smith, who picked Grievant up after she was excused from duty, similarly noticed no signs of intoxication.

---

[5] Unlike Dr. Thuss, Captain Renfro was not compensated for his testimony and met Grievant for the first time the day prior to the arbitration. While Southwest questions Renfro's qualifications, it does not question his motives for offering testimony on behalf of the Union. Southwest has relied on Renfro's opinions on numerous occasions in the past and he has served continuously on the union/management alcohol abuse committee.

[6] Like Renfro, Newman had no motive to proffer false testimony. She and Grievant were mere "acquaintances" that have never socialized outside of work.

Although Southwest hints at the possibility that Grievant did not exhibit signs of intoxication because she drinks regularly and therefore might have a higher tolerance, there is no evidence to support this supposition. Smith and Byrd denied that Grievant was a heavy drinker, and Smith testified that when he picked her up from work, Grievant's conduct was inconsistent with how she behaves when she has had alcohol.

The Union introduced competent evidence that the Grievant was suffering from acid reflux disease on September 1, 2008 in the form of Grievant's own testimony and a note from her doctor attesting that Grievant had been under her care for this condition. It also introduced evidence that acid reflux disease can trigger a false positive on an EBT because of the frequent burping associated with the condition. Dr. Thuss even acknowledged that burping could affect EBT results, if there is alcohol in the stomach that is introduced into the machine. Grievant testified that she burped throughout the EBT and tester DeLisco testified that he advised her not to do so only after the first test.

Dr. Thuss also testified that the smell of acetones could mimic the smell of alcohol, which explains the perception that Grievant had alcohol on her breath. Acetones also, argued the Union, could be detected as ethyl alcohol by the EBT, a point convincingly made by Renfro. Dr. Thuss admitted that he had no experience with the Draeger 7110MK-III-C.

*Northwest Airlines and IBT*, (Meyers, 1996), cited by Southwest in support of its position, is not precisely on point. First, the grievant in *Northwest Airlines and IBT* consumed approximately 16 ounces of alcohol between 11:00 a.m. and 2:00 a.m. the night before she reported to duty, and drank more alcohol the morning of the flight. Id. at 6, 17. Importantly, the Union did not challenge the validity of the EBT results, more or less conceding that the grievant was under the influence of alcohol when she reported for duty. Id. at 18. In the instant matter, Grievant had only one drink, which she had finished by 11:00 a.m. the night before. Most importantly, though, Grievant introduced competent evidence that her EBT results were flawed. Although Southwest argued that it is not relevant whether Grievant was an alcoholic, the Union introduced this evidence for the purpose of rebutting Southwest's argument that her EBT results indicated intoxication when she showed few outward symptoms of intoxication because she was a heavy drinker. Southwest opened the door to this kind of evidence and this kind of evidence further distinguishes the instant matter from *Northwest Airlines and IBT*. Unlike Grievant, in *Northwest Airlines and IBT* the grievant had a history of alcohol abuse. Id. at 7-8. Southwest also cites *Southwest and TWU, Local 556: Venia Arbitration* in support of its position that it had just cause to terminate Grievant. The union in *Southwest and TWU, Local 556: Venia Arbitration*, however, did not challenge the results of the grievant's drug test. The union simply argued that

the grievant's termination was procedurally defective because Southwest failed to notify the grievant within the seven day time limit as prescribed in Article 19 of the CBA. Thus, the situation presented in *Southwest and TWU, Local 556: Venia Arbitration* is the polar opposite of the matter presented here, where the Union challenges the basis for the termination decision but not the process by which that decision was made.

In short, this arbitrator is of the opinion that Grievant's EBT results were likely inaccurate. Because the results of the EBT test are in doubt, the Grievant's employment shall be reinstated. Captain Renfro's testimony caused too much doubt about the accuracy of that test to sustain a termination. In addition, because the Grievant has worked for nearly 20 years with an excellent record, it is unlikely that she would choose to come to work drunk.

**What is the appropriate remedy?**

That being said, the process by which Grievant's termination was effectuated was beyond reproach. The airline scrupulously followed its Alcohol Misuse Policy, which mandates that Flight Attendants submit to an alcohol breath test if a supervisor trained in detecting the symptoms of alcohol misuse has a reasonable suspicion that the individual is impaired due to alcohol. Green, the supervisor that first suspected that the Grievant was intoxicated, had undergone several of Southwest's Drug and Alcohol training sessions at the time. Two supervisors (at least one of whom has attended Southwest's Drug and Alcohol Training Program) must substantiate and concur in the decision to test an employee that is reasonably suspected of alcohol abuse. In this case *three* supervisors trained in Southwest's Drug and Alcohol program agreed that Grievant should be required to submit to an EBT. The policy provides that a single EBT result of .042 or greater, or two consecutive EBT results of .02 or greater, will result in the employee's termination.

Pursuant to Southwest policy, Clark held a fact-finding meeting on September 4, 2009, at which he informed Grievant that if she wanted her medical records considered with respect to her discipline she should submit those to the Medical Review Officer. Grievant did not submit these documents to the company's Medical Review Officer and she waived Board of Review of her termination. In short, Grievant did not bring alternative explanations for her positive EBT results to Southwest's attention until this arbitration. Therefore, Southwest was never given any real reason to question the results of the EBT until this arbitration. For these reasons, while this arbitrator is of the opinion that reinstatement is appropriate, back pay is not.

## Award

The Grievant shall be returned to duty. However, because the company followed its own procedures set forth in its Alcohol Misuse Policy, this arbitrator is of the opinion that the proper remedy is to reinstate Grievant effective immediately with no back pay.